Fleming is submitted. Thank you. The next case for argument, Tinian Women Association versus Department of the Navy. Good morning, your honors. May it please the court. David Henkin appearing on behalf of Tinian Women Association, Guardians of Ghani, Pagan Watch, and Center for Biological Diversity. I'd like to reserve four minutes for rebuttal. Your honor, this case challenges defendants' failure to comply with mandatory procedures under the National Environmental Policy Act prior to making the decision to station thousands of Marines on Guam, a decision with existential consequences for the families who call the nearby islands of Tinian and Pagan home. In order for Marines based on Guam to carry out their mission to defend our nation and our allies, they will have to conduct highly destructive training with mortars, artillery, rockets, and bombs on Tinian and Pagan, turning them into war zones. We seek to compel defendants' compliance with their duty under NEPA to consider impacts from this training, as well as alternatives that could be accomplished with less environmental harm. This appeal raises several issues. I'll turn first to the district court's dismissal based on standing and political question of our challenge to defendants' failure to consider reasonable stationing alternatives. Resolution of both standing and political question is controlled by this court's decision in Center for Biological Diversity v. Mattis, in which this court held that neither standing nor political question were a problem for this court and the lower courts to review defendants' compliance with mandatory procedures under another statute, in that case the National Historic Preservation Act. Both cases deal with the exact same issue, whether when the executive enters into agreements with a foreign country, the federal courts are without any power to review compliance with mandatory procedures, which is distinguishable from the issue of review of the ultimate substantive decision that the executive agencies make. So in the CBD case, the court noted that the NEPA had considered the potential impact on the marine life, on the Duvang. So this seems different because your first challenge is directly to alternative locations. And if the treaties and agreements between the United States and Japan decided that issue, how would a NEPA review in this court deciding that the Navy has to do something about the evaluation of different locations, not for training, that's a separate issue, but for the relocation of the marines, how would this court have the ability to do that? I'd like to understand Your Honor's question. So you're asking about redressability? Sure. I mean, so a political question and redressability. So is there any relief that we could order that would change that decision if it is in fact made at the treaty level between two nations? And is that not in fact a political question? So I guess what I'm asking you is to explain how CBD really supports you when CBD involved similar agreements about moving the air station, but the challenge was not going to have them consider a different location that had already been decided between the two nations. That's correct, Your Honor. They dealt with National Historic Preservation Act and not with alternative station locations, but that's a distinction without a difference here. And the reason is as follows. The basis on which the Ninth Circuit decided that case was that this court and the lower court would not be reviewing the ultimate decision about where the Futenma Air Station would go or whether there would be a relocation to Futenma. The same is true here. This is a NEPA challenge to procedures as to whether or not the Navy complied with its obligations under the National Environmental Policy Act to look at a reasonable range of alternatives before making that decision. In this context, in this procedural challenge, redressability requires that there's some chance that going through the process might alter the agency's decision making. And in the CBD case, that process was not going to change the location of the air station, but the court noted that there had been multiple changes in the planning and the design of the air station. So there's a possibility there could be some change to account for the potential impact on the dugong. But here, is there any chance that the Navy would relocate the Marines somewhere other than Guam? Well, yes, Your Honor. The facts of this case speak to that directly. Well, I know that they changed the number and that some are going to Australia and Hawaii, but still 5,000 were being relocated to Guam. So I guess the idea would have to be that the Marines would be stationed in Guam. No, Your Honor. That's not our position. Our position is that a reasonable range of station alternatives would consider a number of different alternatives. One alternative might be stationing in areas entirely separate from Guam, so no Marines would be on Guam. But another alternative might include fewer. How did we get to the number of 5,000 on Guam and the rest, the remainder, approximately 4,000, going to Hawaii and Australia? Excuse me. Stop here, because in a way we're talking in the abstract up until just now. And as Judge Bates pointed out, there is this integration here of regressibility and political question to some degree. The go-no-go decision to go to Guam is one that's already been made. And then we also have a separate NEPA challenge about, well, what does that mean once you get there? So what I'm having some difficulty with is precisely what would be the remedy you would be granted by the district court? I know there's the general equity in your complaint, but what precisely would the district court order if your position is adopted? Well, the district court would order, we seek both declaratory relief, which is, it was a violation of NEPA, and set aside, vacate the record of decision, both the 2010 and 2015. And then we would also seek conjunctive relief that there would be a stay on activities that would foreclose the consideration of regional stationing alternatives pending full action. Somewhat vague about what that would mean as a practical matter, because doesn't that basically mean unwinding the decision that, okay, now we have the situation with Japan, we have to deaccession our bases, and the military has made a decision, at least for that we're going to Guam, Guam, Tinian, Saipan, et cetera. Wouldn't the government have to unwind that decision for you to be successful? Well, no. In that respect, this is distinguishable from, let's say, salmon spawning, where the court was concerned that we'd have to undo a treaty in order to provide any prospect for relief. And again, in this case, we're dealing with procedural violations. When you have procedural violations, we don't need to prove that they will make a different decision. We just need to prove that they could, and that that could be informed by the... Okay, so now as a practical matter, unwind this decision all the way back to this agreement with Japan. What happens if the district court were to say, you need to go back and look at more alternatives, or different alternatives? Well, if we look at the facts of the case, Your Honor, they started out in the final environmental impact statement, and I would refer you to volume two of the excerpts of record at page 340. And in the final environmental impact statement, they say that as part of that process, they looked at a number of different stationing locations for the Marines. They looked at Hawaii, Alaska, California, and Guam on U.S. territory. They looked at Korea, the Philippines, Singapore, Thailand, and Australia abroad. Now, the problem is, and the reason why we're in court on this issue today, is they did not examine any of those alternatives in the context of a NEPA document. They did not do the statutorily mandated alternatives analysis, and this is the exact same issue that confronted this court in Iliu'ula'u Kalani Coalition v. Brumsfeld, where the Army was proceeding with bringing an armored brigade to Hawaii, without ever doing the analysis of alternate stationing locations. So the problem here, which is, it's a military decision where we put our bases. The court has no business interfering with that. And the response from this court was, yes, the ultimate stationing decision is the Army's to make, and likewise here, the ultimate stationing decision is the Navy's to make, but whether you complied with NEPA, and NEPA's command, the heart of the EIS process, is the alternatives analysis. Whether you complied with NEPA's command to look at reasonable alternatives, that concerns the courts. And so, to unpack... Where does that fit, time-wise, with the agreement with Japan? Well, I'd like to, if I may, Your Honor, just briefly unpack political question versus standing... You may, but would you answer the question first, and then you can unpack whatever you'd like? Where that falls time-wise, is there's a continuing process of implementing the relocation. So the 2009 agreement, the relocation would go forward. It would be completed by 2014. Well, here we are in 2020, and the first Marine hasn't set foot on Guam. Why? Because the Navy understood its obligation, under NEPA and under the NHPA, to do initial analyses with respect to Guam, which is why they did the supplemental EIS, and they ended up delaying even the beginning of any construction until the record of decision there, which came out in 2015, a year after the original agreement with Japan said that the relocation should be completed. Then, while they were doing the supplemental EIS, the United States renegotiated the agreement, and this is critical for standing. Standing is analyzed in terms of where things were when plaintiffs filed their complaint, and where things were was the 2013 agreement, not the 2009 agreement. The 2013 agreement deleted the provision that Marines must relocate to Guam, and it replaced it with language that said that Marines would relocate to, quote, other locations outside of Japan. But it still references the billions of dollars that Japan would contribute toward facilities on Guam. Absolutely, Your Honor. So basically, what the 2009 and 2013 agreements are are not agreements to move Marines to Guam. They're agreements that if the United States does, acts pursuant to the agreement, Japan will contribute financially to the relocation. And that's why you have all the concern in the record about not violating the agreements, not because somehow we violate a treaty. This is not a treaty. It's an executive agreement. But not that we would upset our And so if you look at the, there was a memorandum in the... Let me just go back, because I still don't think I understand as a practical matter what you're asking. I've read those briefs, I've read your complaint. We have the 2009, we have the 2013 agreement. As I understand it, you're saying to the Navy, go back and do a detailed fair analysis of alternative locations. Is that a fair statement? Yes, Your Honor. And locations for the record reflects not only that they looked at in the final EIS, that's the page 340 of the record I referenced, but subsequent to the 2010 record of decision. And while we still had in effect a 2009 agreement that said, if you want Japan's money, Marines must go to Guam, the United States unilaterally decided to change the distribution of forces. Now they were going to go to Hawaii, Australia, and Guam, an option that the Navy has never examined in any environmental impact statement. And back in 2010, they said would not meet the purpose and need. But they did that anyhow. And so what we're saying, in answer to Judge Bade, your previous question, the range of alternatives needs to consider alternate stationing locations. Why is it 5,000 instead of 8,600 versus 2,000? They've never done the analysis of a reasonable range of alternatives that NEPA demands. It's up there. When would they do that now? In other words, we've got the EIS, we have the supplemental EIS, we have the two agreements. Where in the procedural process would that happen now, in your view? In our view, it would happen on remand, Your Honor. Like any other time that an agency does an analysis that NEPA demands, the courts declare that they violated NEPA, they need to go back and do the analysis. That's exactly what the courts ordered in Ilioulo-Kalani versus Rumsfeld. Would they be doing that under the 2009 agreement, or the 2013 agreement, or what? Well, the case Ilioulo-Kalani coalition was an Army case that didn't involve the agreement. No, I'm asking here. Oh, here would be under the 2013 agreement, because that's the... Well, but you told me the standing was determined by 2009. Well, initially in 2009, I mean, sorry, not in 2009, when we filed the complaint, which was 2016. Right. We filed the complaint in 2016. The 2013 agreement was the one that was in effect. And under the 2013 agreement, the Navy is free to place the Marines any location outside of Japan. Okay, so there is also a document, the joint statement of the security consultative committee? Correct. Which predated the 2013 agreement with Japan, which changed the language that you've referenced from saying relocate Marines from Okinawa to Guam, to relocate Marines from Okinawa to other places. But the joint statement talks about relocating Marines to Guam. Is that document binding on the United States government? Is it a binding agreement with the nation of Japan? No, Your Honor. Why not? That's just a statement between the Secretary of State and Secretary of Defense of the United States and the counterparts from Japan. That's why they needed to amend the 2013 agreement. So the two nations at high level indicated their intent with respect to this agreement to relocate the Marines off of Okinawa. And you're saying that statement, we're not bound by that? We could do something entirely different after we entered that statement with Japan? Well, first of all, that statement reflects that even when the 2009 agreement was in effect saying that Marines would relocate to Guam, the United States unilaterally announced to Japan in January of 2012, you know what, actually we're going to move some to Hawaii and some to Australia, alternative stationing locations we've never considered a NEPA document. So they did that under that. And then they needed to amend the 2009 agreement to change the language so that they would be able to ratify the fact that the agreement now is that Marines go to any location outside of... But your challenge is not that they didn't do an environmental impact statement on the issue of moving the Marines to Hawaii or Australia. I didn't see that anywhere in the briefs. I thought your alternative location argument was based on placing Marines on Guam. Well, that's because the plaintiffs in this case are going to be directly affected by the connected training that I see my time is very limited. So you want the Navy to go back and look at all those options, whether it's Hawaii or any other location, for this withdrawal from Japan. Is that right? That's right. And to look at reasonable alternatives and to accept or reject those. Yes, Your Honor. They never did that analysis. The 2013 agreement, which is the one that we filed this complaint, allows that possibility. And if this court agrees that they violated NEPA, or if there's an agreement that they violated NEPA, that is relief that we could get. And that satisfies the very low standard for procedural injury for redressability. Do I only have two minutes and 45 seconds? Yeah. Okay. Well, all I'm going to say then with respect to connected actions is that there were two major problems with the district court's analysis. One is the district court focused on whether there was, quote, an independent objective to moving Marines to Guam without having adequate training, rather than independent utility. There may have been an objective, moving bodies off of Okinawa and moving them to Guam, but there was no independent utility. It would have been, in the words of Thomas V. Peterson, irrational or unwise to move Marines there without training them adequately to do their mission. And then the other thing is that the district court assumed that the Marines could somehow do their training in some other location. The question the record never addresses is, well, what is that location other than the northern Marianas, other than Tinian and Pagan? There's nothing in the record to indicate they could go anywhere else. The statement you're quoting is, I believe, during the process where the Marines were allowed to have these training facilities when they arrived at Guam. But the Secretary of Navy ultimately denied that and said, well, consider this in the quadrennial review. And the Marines were not having full access to this training where they were located on Okinawa. And the record shows that the only place where all of this training was actually available was Camp Pendleton. So that doesn't seem to suggest that moving them to Guam would  Well, the Secretary of the Navy did not make a decision they didn't need more training. The Secretary, rather, made a decision to segment, which is we don't want to deal with this now politically, not militarily. But politically, we just got to push this down the road, which is what NEPA prohibits. As far as Marines on Okinawa, they have their training ranges. They're able to travel to the mainland Japan to do their training. If you look at the record, the only evidence in the record is the only place that would be feasible for Marines to do their training is in the northern Marianas. There is no other location identified. And if there's no rational connection between the facts found and the conclusion reached, then this court needs to reverse. I'd like to reserve the rest of my time. You may. Good morning, Your Honors. May it please the Court. My name is Tecla Hanson-Young, and I represent the Department of the Navy. With me is Kara Johnson with the General Counsel's Office of the Navy. This is not the typical kind of a NEPA case with a typical sort of decision to relocate Marines to Guam. But the Navy was charged with implementing an international agreement that by its terms required the Navy to do so. The agreement itself took more than a decade to negotiate, and it requires the United States, specifically in both the 2009 and the 2013 amendment to that agreement, to relocate Marines to Guam. The Guam relocation is important because it also is required in order to accomplish land returns on Okinawa, and Japan is spending $2.8 billion to fund infrastructure on Guam. It's already spent more than a billion dollars of that funding, and the project, the relocating Marines to Guam will occur no matter whether they receive additional training facilities in the Marianas or not. What counsel said, well, if you look at it a little more organically, they have to get the Marines out of Okinawa. We know that. They have to get out of Japan. So that's the essence of the agreement. And in his view, the 2013 agreement says that they're free to place them anywhere without any restriction, and it must be to Guam. Is that incorrect? Yes, that's incorrect. Both the – let me just speak first about the 2009 agreement, and then I'll talk about the 2013 amendments. So the Guam International Agreement, which is the 2009 agreement, recognized the strategic importance of Guam for the forward presence of Marines. And that was a document that was both signed by Japan and the United States, and that language appears in the agreement itself. The location of Guam was also significant because it would demonstrate the United States' commitment to security in the area and increase the ability of the United States military to deter aggression in the Pacific. The Guam International Agreement also defined the relocation specifically as relocating Marines to Guam, and that's at 1 S.E.R. 173. And if you look at the 2013 protocol amending the agreement, although it reduced the number of Marines moving from Okinawa to Guam, it didn't actually change the definition of relocation. So the agreement – the 2013 amendment still defines relocation in terms of relocating Marines to Guam. The international agreement also specifically committed the United States to taking necessary steps to relocate Marines to Guam and committed the government of Japan to paying $2.8 billion to build infrastructure specifically on Guam. And that language also remains unchanged in the 2013 protocol. The 2013 protocol didn't change the recognition that Guam – didn't change the importance of Guam as a strategic location. And in fact, if anything, it resulted in more Marines leaving Okinawa, which also, of course, is in line with what the plaintiffs are asserting, that it was important to – But there's Guam and there's Guam. Right. And there's only Guam. No, well, there's not only Guam. I mean, the scope of Guam or the scope of something in the Northern Marianas is different than saying, well, somebody – you know, we do recognize the strategic locale of Guam. We recognize that we need Marines there and all the other recognitions in the agreement. But as I understand what they're asking is that because not everyone is going to Guam and because there are other alternatives as to decision on really the amount, the impact. So they're not saying no one should go to Guam, as I understand it. So the question is why is not that a procedural predicate? In their complaint, they did actually only request that non-Guam locations be considered. So this argument about reducing the number of Marines going to Guam and maybe sending more to Hawaii and Australia, that is a new argument that wasn't raised in their complaint and it really hasn't been the focus of their arguments. But even setting that aside, no amount – and the question of – it's an overlapping question, I think, in this case with respect to both redressability and political question. But specifically with respect to redressability, no amount of additional NEPA analysis would actually allow the Navy to change the location of Guam because the location is set out in the Guam International Agreement and that location wasn't amended by the 2013 Protocol. And we know that the changes between 2009 and the 2013 Protocol were not as a result of any sort of NEPA analysis, as the plaintiff suggests. It had to do with – the changes came about through negotiations with Japan and both the United States Government and Government of Japan determining that distributing forces in a more geographically dispersed way would lead to more operational resiliency and political suitability. And there's a declaration that cites two portions of the 2013 – or 2012 Roadmap Adjustment or Joint Statement, and that's at SCR 30. And although it is true that that joint statement isn't binding in the same way that the agreements are binding, it does reflect very high-level political commitments between the United States and Japan and that don't involve the Navy. The Navy wasn't actually involved in those discussions. The decisions were made between the Secretaries of Defense and State and their counterparts in Japan. So an order from the court telling the Navy to go back and study locations besides Guam wouldn't actually change anything on the ground because the Navy has no discretion to move Marines anywhere besides Guam. And obviously, with the specific numbers going to Hawaii and Australia also. Your position is that the Navy is locked into the numbers on Guam? Yes. And although the 2013 protocol doesn't list the specific numbers going to Guam, the number was specifically reached by Japan and the United States. And unfortunately, we don't have the 2012 Roadmap Adjustment in the record, but we know that the number of Marines was a topic of negotiation with Japan and that it wasn't a unilateral decision by the United States. And the plaintiff suggests that the United States has the authority to unilaterally change this agreement, and the fact is it doesn't. There's a term in the agreement itself that says that any changes made to the agreement must be done with consultation with Japan. And there's no provision that grants either the United States or Japan the authority to The location of Guam has always remained the consistent location of Guam, and the page of the record cited to by the plaintiff simply demonstrates the reason for that, which is that Guam is the most westward location of U.S. soil in the Pacific. It minimizes response times as compared to other locations, and it also provides the military with the maximum freedom to use the facilities because there is no foreign government interfering or limiting the government's abilities to use those bases. And the record also shows that no other foreign nation in the Pacific was willing to permanently house U.S. forces. So that discussion, again, wasn't a part of an alternatives analysis in the traditional NEPA sense that the court might usually see, but it served to explain the reasoning behind the United States and Japan reaching its decision to relocate the Marines to Guam. Could the United States decide to relocate fewer than 5,000 Marines to Guam without consultation with Japan? No. The agreement itself says that any changes in the force composition structure identified in the agreement must be done in consultation with the Government of Japan. So the 2013 amendment doesn't say 5,000 Marines. The 2012 joint statement uses that number. So you are saying in the 2013 agreement we were bound to 5,000 Marines on Guam? The 2013 agreement does not specifically bind 5,000 Marines on Guam – bind the U.S. Government to 5,000 Marines on Guam. But again, the plaintiffs have never before their reply brief in an argument today – they have never been concerned about the number on Guam. They've only been concerned about getting Marines off of Guam entirely. And secondly, the change in that number would have to be reached by, again, high-level political negotiations between the United States and Japan, and the Navy really has no say in that. So an order from the court would only be directed towards the Navy to consider different options under NEPA, but there's no discretion on the part of the Navy to actually change the direction that it received from the Secretary. Now, that distinction is a key difference between this case and the Center for Biological like the salmon spawning case, because in Center for Biological Diversity, the court found that the Navy did actually have discretion over how it would construct the base at issue and how it would operate the base at issue. Here, the Navy has no discretion over the location or the number of Marines moving to Guam. It is simply tasked with implementing the agreement. And that is a key distinction. And then again, a second distinction between this case and the Center for Biological Diversity case is that the plaintiffs here are specifically challenging the location, which, as I've said, is foreclosed. There is no discretion on the part of the Navy to change that. I would also like to point out that this case is distinguishable from the Ilio Ula'okalani case cited by the plaintiffs, because there was no binding international agreement that required the Army to, or limited the Army's ability to transform the striker brigade in Hawaii. So the Army did, in fact, again, as in the Center for Biological Diversity case, have discretion over that component, and it just decided not to study that alternative. Here, the Navy has no discretion over this location, because it is driven by the international agreement. So for either reason, either lack of redressability or for political question, this court should affirm the dismissal of the alternatives claim. I would briefly, if the court has no additional questions on the alternatives claim, I would move to briefly discussing the challenge that did proceed. And I think the fact that we have the alternatives claim on the one hand and then other challenges under NEPA to the Navy's analysis also just shows that the Navy isn't overreaching in requesting affirmance of the dismissal of the claim. In other words, dismissing the claim for lack of redressability or in political question is a fairly narrow application of either of those doctrines, and the types of decisions that the Navy has discretion over are subject to review by this court. So for example, the second claim that is brought by the plaintiffs here, which basically boils down to the plaintiffs' challenge to the Navy's decision concerning what type of training its forces need. And that kind of a decision is granted the highest level of deference by the courts, because it depends on the application of military expertise and a weighing of political and strategic values that are really within the military's discretion. The plaintiffs argue that the Navy should have considered the Guam relocation decision and the separate, yet to be approved training proposal in the same environmental impact statement because they are connected, allegedly connected actions. And the fact is both projects have independent utility. As I've said, the relocation is driven by the international agreement. It will go forward regardless of whether the more comprehensive training proposal envisioned by the Marine Corps goes forward or not. And there is nothing in the record that suggests that the higher level decision makers within the Navy thought that the Marines could not relocate to Guam unless they had that additional training. And I would direct the court to the discussion. There's various memos and emails in the record at SCR 147 and 148 that really sort of describe the internal deliberation that was occurring within the Navy between the Marine Corps and the Navy, which ultimately was resolved by the Secretary of the Navy, where the Marine Corps was responsible in Okinawa for Okinawa-based Marines. For example, tanks had not been allowed to be used on the ranges in Okinawa for decades. And so even though they had those ranges there, they couldn't use them and they weren't actually able to get all of the training that they needed in Okinawa anyway. And ultimately, the Secretary of the Navy decided that the acknowledge the training deficiencies in the Pacific, but decided that they would be better addressed in a more comprehensive review process called the Quadrennial Defense Review, and that it was more important to proceed with the Guam relocation and that only the minimum amount of training that would be required for the Marines on Guam would be considered a part of the relocation action. And the minimum amount of training for the Marines on Guam are the individual skills and small unit level training, which is going to be occurring on the four ranges in Tinian. Would that Quadrennial Defense Review and a decision to enhance the training facilities trigger EIS process? It, in fact, has. And that's the separate comprehensive training proposal that the Navy is actually evaluating now and put out its draft environmental impact statement for. I also want to emphasize for the Court that the draft environmental impact statement for that more comprehensive training proposal has actually been withdrawn at this point. So, in fact, there is no approved concrete proposal. And because there is a new draft environmental impact statement that's being prepared, the Navy has actually put its decision to construct the four ranges on Tinian on hold until the issue of what training will go forward on Tinian is resolved. Plaintiff's argument is that the training facilities on Tinian would not be built absent the relocation of the Marines on Guam, sort of the flip of what you've been discussing, which is that the Marines would be relocated with or without that training facility. Certainly, I know the Navy argues that they would construct that facility anyway, but clearly the 5,000 Marines on Guam are going to be the primary users of that training facility if it's built. What is there that shows that that training facility actually would be built if the Marines were not relocated so it has separate utility? I would direct the Court to SCR 1883 and 1937-40, which explains that the training proposal has independent utility because it will meet joint, multinational, and long-term training goals that are beyond the specific training needs of the Guam-based Marines. Also, the record, again, at SCR 1883 and specifically 1962 and 1963 contain further discussion of that and explain that the training ranges proposed in Tinian would not only serve United States allies, which would advance international relationships and international training, which is a key goal that is different from the relocation itself. This Court's case law has made clear that the Court only needs to find that one project would go forward, that one of the two projects has independent utility. They don't both have to have independent utility in order for them to be evaluated separately. Here, we don't have that issue because, as we've shown, both projects have independent utility, but if the Court were to have some concern, it would only have to find that one had independent utility. Also, this Court's case law makes clear that simply because one project will benefit from another project doesn't mean that the actions are connected or that they If there are no further questions, we would ask that the Court affirm the judgment of the District Court. Thank you. Thank you. You have 41 seconds. Pretty hard to say anything in 41 seconds, so if you could put two minutes  Thank you. With respect to independent utility, the decision to relocate Marines to Guam was made in the 2010 Record of Decision. At that time, there was no CGMT project. There is no evidence in the record that there would have been any additional training done in the northern Marianas in the absence of moving 5,000 Marines to Guam. There certainly would not be the same level, the same tempo and intensity of training, 20 weeks of training on Tinian, 16 weeks on Pagan, if you didn't have 5,000 Marines that need to meet their weekly training requirements. If you look at the record, at Page's excerpt of record, 359 to 360, every week Marines need to use mortar and artillery ranges, landing beaches, automated multipurpose range, company fire movement range. These are things that the Marines need to do every week. There was an analysis that was done by the Navy itself, its joint Guam program office, and this is the record at Page 467, that training in the northern Marianas is essential, and the reason is provided on Page 464, that traveling to any side of the northern Marianas would be cost-prohibitive, inefficient, time-consuming, logistically complicated. So at the operative time in 2010, there was no reason to believe that anyone would be traveling from far across the Pacific on a weekly basis to be doing this essential training other than the Guam-based Marines. Switching gears to political question and redressability, the 2013 agreement only says that 9,000 Marines need to be moved to locations outside of the United States. There's no binding agreement about how many need to move to Guam. It's purely a financial agreement. The United States already changed that and said some are going to Hawaii and Australia. They never examined that in a NEPA document. They should, and that provides redressability. It is not a political question. Thank you, Your Honor. Thank you. Thank you both for your arguments. Very interesting case. Case just argued is now submitted and we're adjourned for the morning. Thank you. Thank you.
judges: Farris, McKeown, Bade